## No. 104.

### WILLIAM ENDERS VS. JOHN A. SKANNAL.

Where, under a written contract, and for a valuable consideration, plaintiff acquired the privilege of erecting a sawmill on defendant's land and cutting and sawing timber therefrom, and before the expiration of the time allowed by the contract, his son in charge and his employees are driven from the place by violence, and plaintiff compelled to remove the mill, the jury, in estimating the damages, are not limited to the actual pecuniary loss resulting from a breach of the contract, but may treat the mode of its violation as an offense, and award damages therefor.

The wrong to the plaintiff was not less personal because the violence was used upon his employees, than if directed against himself. In such cases much discretion is left to the jury in assessing the damages.

APPEAL from the First District Court, Parish of Caddo. *Taylor*, J.

---

*Wise & Herndon* and *Land & Land* for Plaintiff and Appellee:

1. In a doubtful case the agreement is interpreted against him who has contracted the obligation, and also against him, whether obligor or obligee, when the doubt or obscurity arises from a want of necessary explanation which he should have given. C. C. 1957-8.

2. Damages due to the creditor are the amount of loss he has sustained, and the profit of which he has been deprived; when debtor is in bad faith he is responsible for such damages as are the immediate and direct consequence of the breach of the contract, whether they could have been foreseen or not; the jury is bound to give such damages as will fully indemnify the creditor; and in cases of offenses and quasi offenses, much discretion must be left to the jury. C. C. 1934.

3. On the mere quantum of damages, the Court will not disturb the judgment of the court below, or the verdict of the jury, unless the amount is manifestly excessive, or clearly unsupported by the evidence. 33 An. 26, 1053.

4. The law abhors all attempts to seek redress through violence and force, by persons who fancy themselves injured or are really so. Such transgressors will be mulcted in punitive damages—proportionate to the offense and the standing of the parties. 1 R. 141; 5 An. 337; 29 An. 223; 34 An. 1158.

*Alexander & Blanchard* for Defendant and Appellant:

1. The plaintiff himself first violated the contract, and the injuries of which he complains were superinduced by his own wrongful acts.

"A party can recover no damages for an injury to which he has himself contributed." *Volenti non fit injuria.* 17 L. 361; 18 L. 339; 7 An. 321; 8 An. 71; 28 An. 710.

2. "Plaintiff cannot take advantage of a sudden ebullition of passion, when no great injury is inflicted, to enrich himself at the offender's expense." 13 An. 116.

"Where both parties have reciprocally violated the law, no damages will be awarded to either." 15 An. 681; 34 An. 935.

3. Our law nowhere authorizes exemplary or punitory damages for a breach of contract. Such damages are only allowed in cases of offenses, quasi offenses, and quasi contracts. In all others, the law expressly forbids them.

Our Code provides two modes, and only two, for measuring damages for a violation or breach of contract:

One, where the debtor has been guilty of no fraud or bad faith, when he is liable for the actual damages suffered by the other party. The other, where the debtor has been guilty of bad faith—that is to say, has violated the contract through "motives of interest or ill-will,"

when consequential damages, or rather, such as are the immediate and direct consequence of the breach of contract, are allowed.

The compilers of the Code, to further emphasize these rules, added the words that, " even where there is fraud, the damages cannot exceed this;" and again, in giving to the Judge or jury much discretion in the assessment of damages for offenses and quasi offenses, are careful to add that, " in other cases they have none." C. C. 1934.

In requiring a strict adherence to these rules, for the measurement of damages for a breach of contract, our Court has gone so far as to declare that, "Beyond this, juries have no more right to exact a larger sum from a debtor than they have to increase the amount due by a promissory note." 3 An. 149, also same volume, pp. 110, 140.

4. "Damages for breach of contract are those which, incidental to and caused by it, may reasonably be supposed to have been contemplated by the parties at the time of the contract. Damages for supposed profits, based on the speculative opinions of witnesses, cannot be given." 11 An. 300; 3 An. 105, 140, 149; 6 An. 365, 491; 17 An. 239; 18 An. 646 25 An. 419; 28 An. 777; 29 An. 286; 30 An. 264.

5. An employer is not entitled to recover any damages for personal violence to his employees. The right to claim damages for such violence is a personal one, which belongs to the employees alone, and cannot be exercised by their employer.

All "illegal acts, done wickedly, and with intent to injure," are classed as "offenses" under our law. They constitute one of the sources of obligations, for out of them arises an obligation in favor of the person injured, against the person who commits the act of violence, for the damages suffered by him. This right of action is a strictly personal one to the injured person, and can be exercised by no one else, save in the one exceptional case provided by the Code, viz: If death ensues, the right of action survives in favor of the minor children and widow of deceased. C. C. 2315; 10 An. 33; Sedgwick on Damages, p. 549.

---

The opinion of the Court was delivered by

Todd, J. This is an action to recover damages for an alleged violation of a contract and eviction from certain lands by means of violence and threats.

The defense is substantially the general issue and the contention that it was the plaintiff who had first violated the contract and had misconstrued it throughout.

The case was tried by a jury, which gave a verdict against the defendant for four thousand dollars, and he has appealed.

The plaintiff is engaged in the manufacture of furniture, sash, doors, blinds, etc., in the City of Shreveport; he had gone to considerable expense in establishing the factory and had quite a number of operatives employed, some of them, as the evidence shows, brought from distant States.

Finding it difficult, if not impossible, to procure lumber from the sawmills in the vicinity of the kind needed in his business, which was principally cotton-wood, gum, ash, etc., it became necessary to establish a mill of his own, in order to have a constant supply of the lumber required.

The defendant was the owner of a plantation on Red River, consist-

ing of about 1,000 acres, 250 in cultivation and the balance heavily timbered.   He wanted more of his land cleared and needed lumber to improve his plantation.   Plaintiff required timber for his mill of the kinds designated, with which the land abounded, and moved by these considerations, the defendant drew up and plaintiff signed the following writing:

"I obligate myself, for the privilege of cutting timber off that portion of J. A. Skannal's Chalk Level place which he intends clearing, and for putting a sawmill on the place, to furnish him, free of cost, twenty-five hundred feet of lumber during the month of August, and seventy-five thousand feet additional as he may order during the remaining twelve months.

"I further obligate myself to burn and move off the ground, all logs and brush left from timber cut in a reasonable length of time, and to burn all sawdust made by the mill, and to interfere with no hands on the place, by hiring or other means, without consent of J. A. Skannal. The lumber I furnish him is to be good cotton-wood lumber.

                                                         WM. ENDERS."

"The twenty-five hundred feet in first part of this contract should be twenty-five thousand.

                                                         WM. ENDERS."

The defendant did not sign, but when this was suggested to him by plaintiff, he replied, "that he was a gentleman and was good for what he said."   It is not questioned that, though the contract was in this form, it was essentially commutative in its character.

The subsequent difficulties of the parties grew out of the constructions placed by them respectively on this agreement.

The evidence shows that, shortly after its execution, the plaintiff erected the sawmill on the land in a locality which he deemed most convenient to the timber, with the approval, as to the choice of location, of the defendant—the original cost of the mill and of its transportation and construction entailing an expense of several thousand dollars.   He employed a considerable number of hands in felling and cutting the timber, and commenced sawing large quantities of lumber. He supplied the defendant with lumber from time to time in such quantities as he needed or called for, in compliance with the stipulations of the contract.   There is, at least, no complaint that he failed in this respect.   He did not deliver the entire quantity mentioned in the contract, being prevented from doing so by events which we will proceed to relate.

The undertaking of the plaintiff had proceeded apparently to the satisfaction of both parties until January, 1882.

Enders vs. Skannal.

In that month, the overseer of the defendant ordered the laborers, who were colored, and then under the charge of the plaintiff's son, to leave the premises, and threatened to have them arrested for trespass if they did not. When this was reported to the plaintiff, he dispatched to the place a number of white laborers, who were put to work felling the trees. What then occurred is best told by one of the witnesses. Young Enders, son of the plaintiff, states:

" Mr. Skannal rode up and told them that the next man that put an axe in a tree he would kill him on the spot; and he then came to the mill and told me that if I allowed any more trees to be cut, he would kill me; be was not armed, but said he would go up and get his gun."

At this the laborers ceased work and returned to Shreveport.

The plaintiff thereupon sent down another set of hands in charge of a Mr. Chaffin. We leave the same witness again to say what followed. He states:

"The men had not made more than four or five strikes with their axes, before Mr. Skannal rode up with his gun. He rode to the hands and told them, that the first man who struck another axe in a tree, he would kill him on the spot. He had a Winchester rifle. He met Chaffin and me in the road, when he was coming toward the house, and he said: ' Chaffin! by God! are you at the head of this business?' Chaffin replied that he had come down there for Mr. Enders to cut timber. Skannal then said: 'Chaffin, I will give you fifteen minutes to leave my place; if you don't, I will kill you on the spot.'

"Chaffin then said: ' Skannal, that is no way to do business; there is law in this country, and there are other ways for you to stop us from cutting without bringing your gun down on us.' Skannal then said: ' Damn the law! I own this land and I am going to have things here my way, and if I can't do it any other way, I will do it with my gun.'

"In the meantime the hands returned to the house, when Skannal rode up and said: ' Gentlemen, I will give you five minutes to leave my place, and if you don't, I will be forced to use my gun on you.'

" All of the hands left but two. One of these asked for a little more time to get ready. Skannal then got down from his horse and said: ' I'll be God damned if you don't leave now.'

"Skannal then commenced abusing plaintiff, saying that if the old man had come there himself, things would have been settled long ago.

"Skannal then told us that he did not propose to have any one cut on his land, that he intended to clear every damn foot that was under fence and he did not propose to have another tree cut there."

The statement of this witness is fully corroborated and, in fact, its correctness on this point is not questioned.

In consequence of this violence the engagement between the parties was abruptly terminated, and the plaintiff left the premises and removed his mill therefrom.

The defendant's counsel, while they do not approve of his conduct, undertake to justify the defendant's asserted construction of the contract which led to his violent proceedings.

According to defendant's construction and that of his counsel, the main, if not the sole object of the contract was to procure the clearing of the defendant's land, and that all the operations and movements of the plaintiff should be conducted mainly to that end. The plaintiff, his laborers and his mill were not to be in the defendant's way; they must get out of his way when his (defendant's) part of the work of clearing was going on. Everything must subserve this purpose. We do not so read the contract, and do not so construe it intrinsically, or when viewed in the light of the attending circumstances. The very letter of the writing shows that the business of the mill was to continue at least one year. And when we consider the object plaintiff had in view, and what preceded the execution of the writing, in both parties going over the entire tract and examining the timber, and also the character and dimensions of plaintiff's business at that time and prospectively, and moreover consider the very liberal price he paid for the privilege of disincumbering the land of worthless timber—at least, comparatively worthless to the defendant—and other circumstances we need not detail, we are satified that it could hardly have entered into the contemplation of either party that plaintiff was not to have ample time to accomplish the purposes and ends he had in view, prompted and to be measured by the requirements of his business, the character of which must have been known to the defendant—that is, time enough to cut down and saw up all the timber he wanted, if it took years to do it. He made no objection to the size or capacity of the mill; he consented to its being placed where it was; he could have formed some idea of the time it would probably take to saw up all the timber on the land; and if this arrangement did not suit him, he should have so informed the plaintiff.

We have attentively read the evidence, and we think it but the shallowest pretense, that plaintiff was the first violator of the agreement, and justified the conduct of the defendant. It can hardly be seriously urged.

In regard to the damages allowed, we are not satisfied that they are excessive. The defendant's counsel earnestly contend, that the damages should be confined to the actual pecuniary loss resulting from the breach of the contract, which they proceed to estimate at a very low

figure. Even if that were the limit in this case, it would sum up· to no insignificant amount. The expenses incurred in transporting the machinery and constructing the mill, and then taking it down and removing it; the loss to plaintiff's business in being deprived of the means of supplying himself with the kind of lumber needed for .his factory, made at his own mill at an expense, as proved, of $4 less per thousand than if he bought it at other mills, even if it could be pro-cured at all, all these and more were legitimate matters for the com-putation of the actual pecuniary loss.

They were not mere speculative opinions of future profits. But we do not agree with the counsel that it was to be thus limited. There was not only a breach of the contract, but it was a breach made in such a way and accompanied by such acts as to constitute an ·offense under the laws.

We have held, that the plaintiff had a legal right to stay on defend-ant's land; he was driven therefrom by threats and violence. The outrage to his feelings for such wanton and unjustifiable conduct should rightfully be weighed and considered. Nor was it any less;.a personal wrong to the plaintiff because the violence and threats which evicted him from the land, were made against his son and employees than if directed against him in person. There exists no such legal distinction as the counsel announce. This feature of the case is one, in the determination of which, much .discretion is allowed the jury. C. C. 1934; 29 An. 223; 34 An. 1158. We cannot say that it has been abused in this instance. ·If the verdict but serves to teach the defend-ant that there is still some potency in the law he so much despises, and that its ways and methods, if somewhat slower, are surer, and even less expensive than those he so much affects, it may prove that in this instance the jury exercised a wise discretion and conveyed a whole-some lesson.

Judgment affirmed.